UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HERMAN MAURER,

       Plaintiff,                                  Civil Action No. 14-CV-10136

vs.                                          HON. BERNARD A. FRIEDMAN

CAROLYN W. COLVIN,

       Defendant.
_____/

### OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is presently before the Court on cross motions for summary judgment [docket entries 27 and 29]. Magistrate Judge Patricia T. Morris has submitted a Report and Recommendation ("R&R") in which she recommends that plaintiff's motion be denied and that defendant's motion be granted. Plaintiff has filed objections to the R&R, and defendant has responded to plaintiff's objections. For the reasons stated below, the Court shall reject the R&R, grant plaintiff's motion, deny defendant's motion, and remand the case for further proceedings.

Plaintiff has brought this action under 42 U.S.C. § 405(g) to challenge defendant's final decision denying his application for Social Security disability insurance benefits. An Administrative Law Judge ("ALJ") held hearings in April and August 2012 and issued a decision denying benefits in September 2012 (Tr. 7-20). This became defendant's final decision in November 2013 when the Appeals Council denied plaintiff's request for review (Tr. 1-3).

Under § 405(g), the issue is whether the ALJ's decision is supported by substantial evidence, which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229

(1938). In making this determination the Court does not review the record de novo, and it may not

weigh the evidence or make credibility findings. If supported by substantial evidence, defendant's

decision must be upheld even if substantial evidence would have supported a contrary decision and

even if the Court may have decided the case differently in the first instance. *See Engebrecht v.*

*Comm'r of Soc. Sec.*, 572 F. App'x 392, 396 (6th Cir. 2014).

At the time of his August 2012 hearing, plaintiff was 56 years old. He has a high

school education and work experience as a software manager and taxi driver. Plaintiff claims he has

been disabled since April 2007[1] due to low back pain, headaches, partial paralysis on his left side

due to a stroke, high blood pressure, and memory and concentration problems (Tr. 71, 77, 240). His

insured status expired on March 31, 2010 (Tr. 13, 226).

The ALJ found that plaintiff's severe impairments are "adjustment disorder with

depressed mood, status post cerebrovascular accident with memory loss, and degenerative disc

disease of the lumbar spine" (Tr. 13). The ALJ found that plaintiff cannot perform his past work,

but that he has the residual functional capacity ("RFC") to perform

> a wide range of light work . . . that precludes: lifting and carrying
> more than 30 pounds occasionally or 20 pounds frequently; standing
> more than about 30 minutes at a time or a total of six hours of an
> eight-hour workday; walking more than one-quarter of a mile at a
> time or a total of two hours of an eight-hour workday; si[t]ting for
> more than about two hours at a time or six hours of an eight-hour
> workday; and more than occasional use of the left upper extremity for
> reaching vertically, reaching horizontally, and performing gross and

---

[1] In an earlier application for disability insurance benefits, plaintiff claimed he became
disabled in November 2002 when he had a stroke (Tr. 84). That application was denied in July
2006 based on an ALJ's conclusion that plaintiff could work as a computer operator, a peripheral
systems operator, or order clerk (Tr. 92). That decision apparently was not appealed (Tr. 10).
The April 2007 disability onset date claimed in the present case coincides with the date when
plaintiff was fired from his most recent job as a taxi driver (Tr. 72).

fine manipulation activities.  Additionally, due to a combination of
pain and memory loss, the claimant is limited to unskilled work.

(Tr. 15-16.)  A vocational expert ("VE") testified to the existence in Michigan's lower peninsula of

1,200 information clerk jobs, 1,215 interviewing jobs, and 2,947 inspector jobs (Tr. 42) which a

person of plaintiff's age, education, work experience, and RFC could perform.  The VE indicated

that the number of jobs would be reduced to 900, 905, and 983, respectively, if the hypothetical

person needed a sit/stand option (Tr. 43).  The ALJ cited this testimony as evidence that work exists

in significant numbers that plaintiff could perform to support his conclusion that plaintiff is not

disabled (Tr. 19-20).

Having reviewed the administrative record, the R&R, and the parties' briefs, the

Court finds that the matter must be remanded for further proceedings because the ALJ failed to make

a number of important findings and to incorporate them in his hypothetical question to the VE.

Because the hypothetical question failed to describe plaintiff in all relevant respects, the VE's

testimony cannot be used to carry defendant's burden of proving the existence of a significant

number of jobs plaintiff is capable of performing.  Further, the VE testimony itself is insufficient

to support the ALJ's conclusion, even if the ALJ's hypothetical question were not flawed.

The first problem with the hypothetical question is that it did not include any findings

regarding the side effects of plaintiff's medications.  During the relevant time frame (i.e., from the

disability onset date through the date last insured), plaintiff was prescribed a large number of

medications for his various physical and mental impairments including, among others, Amlodipine,

Fluoxetine, Lipitor, Metoprolol, Naproxen, Trazodone, Prozac, Lisinopril, Lopressor, potassium

chloride, Amitriptyline, Inderal, and Propranolol (Tr. 243, 272, 293, 336).  Some of these

medications have common side effects, including dizziness, confusion, and headaches.  *See*

http://www.drugs.com/sfx/[drug name]-side-effects.html.  On his Function Report, plaintiff listed "dizziness and confusion" as side effects he experiences (Tr. 262), and he testified to experiencing "headaches, which leave me fuzzy" (Tr. 71, 77).

The ALJ entirely neglected to develop the record as to this medically and vocationally significant issue.  The ALJ asked plaintiff no questions about his medications or side effects and he made no mention of this issue in his written decision. The Sixth Circuit has held that the ALJ must evaluate "[t]he type, dosage, effectiveness, and side effects of any medication" as part of the process of determining the extent to which symptoms impair a claimant's capacity to work. *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 532 (6th Cir. 2014) (quoting 20 C.F.R. § 416.929(c)(3)(i)-(vi)).  Further, hypothetical questions to vocational experts must account for medication side effects. *See White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 789-90 (6th Cir. 2009).  On remand, the ALJ must (1) determine which medications plaintiff was taking during the relevant time period, (2) make findings as to the nature and extent of these medications' side effects, if any, and adjust his findings as appropriate regarding plaintiff's RFC, and (3) incorporate these findings in proper hypothetical questions to the VE to determine whether work exists in significant numbers that can be performed by a person such as plaintiff experiencing such side effects.

The ALJ also neglected to develop the record, and to make findings regarding, plaintiff's headaches and obesity, both of which appear to be significant medical issues.  Regarding the former, which plaintiff listed among the conditions that limit his ability to work (Tr. 71, 240), the record contains several entries suggesting plaintiff has frequent – perhaps even daily or continuous – headaches (Tr. 255, 272, 302, 375).  While several of the medical records containing these references post-date the expiration of plaintiff's insured status, the Court notes that plaintiff's

4

treating physician included headaches among plaintiff's "Chronic Problems" (*see, e.g.,* Tr. 324, 328, 331). One medical record dated November 4, 2010, indicated that plaintiff "has had chronic daily headaches for several years since [cerebral vascular accident] in 2002" and that plaintiff "says that they are located frontally and are throbbing in character" (Tr. 378, 380). In May 2012 plaintiff told a physician who examined him at defendant's request that "he had a few headaches in 2000 . . . but after that the frequency . . . is that they are present all the time" and that "this pain [is] at a level of 4 on a scale of 1-10" (Tr. 396). The ALJ made no findings regarding plaintiff's headaches and noted only that plaintiff "reported headaches" to Drs. Brown and Sachdev (Tr. 16, 17). On remand, the ALJ must develop the record as to this issue; make findings as to the severity, frequency, and duration of plaintiff's headaches; as necessary, reevaluate plaintiff's RFC; and include any adjusted RFC in revised hypothetical questions to the VE.

Similarly, the ALJ neglected to develop the record, and to make findings regarding, plaintiff's obesity. Plaintiff testified that he weighs 275 pounds (Tr. 78). He is approximately 68 inches tall (Tr. 397). Plaintiff's lowest weight in the record appears to be 216 pounds in November 2010 (Tr. 379), while it hovered generally in the 240-260 pound range. At 264.8 pounds, plaintiff's body-mass index ("BMI") was 39.67 (Tr. 344). At 275 pounds, according to the Centers for Disease Control, plaintiff's BMI would be 41.8 and he would weigh approximately twice that of normal for a man of his height. *See* http://www.cdc.gov/healthyweight/assessing/bmi. While the issue in this case is whether plaintiff was disabled before his insured status expired in March 2010, the medical records identify plaintiff's obesity as a chronic problem (*see, e.g.,* Tr. 324, 326, 328, 331), and plaintiff testified that "since I've had my stroke, I've steadily gained back all the weight that I had previous to my stroke" (Tr. 78).

5

Under defendant's regulations, a person with a BMI of 30 or above is obese. *See* SSR 02-1p. While obesity is no longer a "listed impairment," this Social Security ruling does require the ALJ to consider it at all steps of the sequential process while evaluating applicants for disability insurance benefits. *See id.,* Policy Interpretation ¶ 3 ("We will consider obesity in determining whether: The individual has a medically determinable impairment. . . . ; [t]he individual's impairment(s) is severe. . . . ; [t]he individual's impairment(s) meets or equals the requirements of a listed impairment in the listings. . . . ; [t]he individual's impairment(s) prevents him or her from doing past relevant work and other work that exists in significant numbers in the national economy."). Further,

> [o]besity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators *must consider* any additional and cumulative effects of obesity.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00Q (emphasis added).

In the present case, there is no indication in the record that the ALJ gave any consideration to plaintiff's obesity. At the hearing, the ALJ did not ask plaintiff how his weight affects his other symptoms or his ability to work, noting only that plaintiff "gained a few pounds" (Tr. 78); and in his written decision, the ALJ did not mention plaintiff's obesity at all. On remand, the ALJ must make specific findings as to the effect, if any, of plaintiff's obesity on his other impairments, including the degenerative disc disease in his lumbar spine, and his ability to work.

In particular, the ALJ must determine whether plaintiff's back pain is exacerbated by his obesity such that (1) his ability to sit or stand or walk is affected or (2) he requires a sit/stand option. The ALJ must include any such findings in reevaluating plaintiff's RFC and in framing revised hypothetical question(s) to the VE.

Finally, remand is required in this matter because the VE testimony elicited at the August 2012 hearing did not provide substantial evidence for the ALJ's finding regarding the existence of a significant number of jobs that plaintiff could perform. The ALJ's hypothetical described a person of plaintiff's age, education, and work experience, who could do light-level work and whose left arm and hand could be used only occasionally (Tr. 41). The ALJ then asked the VE whether jobs for such a person exist in Michigan's lower peninsula:

> A. So occasional left – let's see.
> I could do information clerk. These are light, unskilled. Reduce it, because of the upper extremity and the sitting and standing, to 1,200.
> Most of my carpal tunnel jobs I've got here require some standing. Primarily this is a sit-down job, is what we're talking about.
> Let's see what else I've got here.
> There are interviewing jobs. And that, again, is going to be reduced by 50 percent. It would be 1,215 for the same reason.
> And there – there could be some inspection jobs, like, confection – like, candy inspecting. So very light product. Reducing that, again, by 50 percent to 2,947.
>
> Q. And is your testimony consistent with information provided in the Dictionary of Occupational Titles?
>
> A. Consistent with the exception of all the sitting, standing, walking from the hypothetical and left upper extremity. That would be based on professional experience.

(Tr. 42-43.) Cross examination proceeded as follows:

> Q. With the respect to [sic] the jobs that you've already identified, if we add to that hypothetical a sit/stand option at will – I understand

what the Judge said, but if we add that and just modify it somewhat, would that in any way alter the – your testimony?

A. I was kind of figuring sit/stand when I did this –

Q. Okay.

A. – because all of the parameters of that. Possibly – let me look at this.

     I would think the at-will part would probably reduce this further because that really is sitting and standing, what we're talking about.

     So I'd take the info clerk down by a third, to 900. And the next job to 905. And then 983.

Q. Okay. I think I know what an inspecting job is, but when you say information clerk, that's an unskilled job?

A. This one is, yeah. There are – I can give you a DOT if you'd like it.

Q. Not necessarily, but what –

ALJ: Can you give us an example?

BY THE ATTORNEY:

Q. Would you, please?

A. Sure. Just one second.

     This is an information clerk out of the DOT. It provides travel information for bus or train patrons, answers questions regarding departures, arrivals, stops. It's an unskilled, light, SVP 2, light per the DOT. . . .

Q. This hypothetical job that we're referring to, where does that individual get the travel information in order to inform others?

A. One would be – this is just an example.

Q. Okay.

A. One example – I can give you other examples. Just a moment.

     I would think they would work at, you know, like, a bus

8

terminal. To me, that's what that means. And people are coming up there asking questions. Or, perhaps, they work in an office and people are calling. . . .

Q. And it definitely characterizes this as unskilled –

A. Yeah. I can –

Q. – with those tasks?

A. I can show you – I've got the DOT up.

*   *   *

A. And provides travel information for bus or train patrons, answers inquiries regarding departures, arrivals, stops, destinations, and scheduled busses or trains, describes route services, accommodations available, furnishes patrons with time tables, travel literature, computes and quotes rates for interline [sic] trips.
    This – I'm telling you, this is what it is.

Q. What was the last thing? It computes what?

A. Rates for trips, tours, discounts for children. I'm sure this is something that they would – it would be posted and they just look –

Q. Mm-hmm.

A. – pull something up. But it's an unskilled, light job, SVP2, light per the DOT.

Q. So one would have to be reasonably communicative in the sense of communicating this information to others?

A. Absolutely.

*   *   *

Q. Okay. The interview – you said interviewing jobs – interview jobs? Interviewing jobs? Is that what you said?

A. For the information clerk, are we talking about now?

Q. Well, I thought there was a separate category. Maybe I missed it.

9

A. Oh.

Q. After you said information clerk, what was the next job that you said?

A. Well, before that, I had –

Q. I thought you said –

A. I believe I had information clerk – oh, interviewer.

Q. Right. Interviewer. Okay.

A. Yeah. Okay.

Q. What –

A. And, again –

Q. What does that person do?

A. Okay. Let me look.
        Call this a survey worker – interviewing, merchandising rep, public interviewer, census enumerator.
        I can give you a DOT if you'd like.

* * *

Q. Is this where an individual goes to another home to interview, like a censor [sic] –

A. That would be an example, but I don't –
        Here's a new account interviewer, clerical – that's sedentary. Sorry. Just a minute.
        You can contact them on the street, at the place of business, by telephone. So the DOT compiles a lot of – otherwise the DOT would just be so – so large.

Q. Okay.

A. I'm sorry.

Q. And that's being characterized as light?

\*    \*    \*

Q. Do you know what would make it light as opposed to sedentary? With the exception of a censor [sic] person going from house to house, if you you're [sic] just calling people –

A. On the phone?

Q. – on the phone, isn't that – aren't, essentially, just seated?

A. Right. Unless –

\*    \*    \*

Q. And then those – the interviewer position would require, again, reasonably adept communication skills as well?

A. I would agree.

(Tr. 43-48.)

The ALJ noted that the VE testified, in response to the hypothetical question, to the existence of 1,200 information clerk jobs, 1,215 interviewing jobs, and 2,947 inspector jobs (Tr. 19). Based on this testimony, the ALJ concluded that "the claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy" (Tr. 20).

Substantial evidence does not support this conclusion. The VE's testimony was so uncertain, tentative, confused, and equivocal, it is difficult to know what types of jobs he identified. Even if the testimony can be understood as having identified jobs responsive to the hypothetical, the ALJ could not reasonably find that plaintiff could perform the information clerk or interviewer jobs, given that both require "reasonably adept communication skills." Plaintiff testified that due to his stroke in 2002, he lost the mental ability to do his skilled, software managing job; and that he lost his next and final job as a taxi driver, classified as semi-skilled, in 2007 because he could not figure out the most direct routes to get customers to their destinations although he had grown up in that

11

town (Tr. 72-74).  The ALJ did not suggest he disbelieved or discounted this testimony. The ALJ noted plaintiff's slowness in testifying (Tr. 75), as did the psychologist who examined plaintiff at defendant's request (Tr. 390).  The ALJ's written decision offers no explanation for finding that plaintiff lacks the mental ability to drive a taxi, and must therefore be restricted to unskilled work (Tr. 16), and yet somehow retains the ability to conduct interviews and to provide members of the public with various and sundry travel information.  The substantial evidence standard is a low bar, but it is not met in the present case as to this issue.

For these reasons, the Court concludes that the ALJ's decision in this matter is not supported by substantial evidence and that the record has not been adequately developed. Remanding the matter for an award of benefits would not be appropriate at this time because the record, in its current state, is not such that "proof of disability is overwhelming or . . . proof of disability is strong and evidence to the contrary is lacking." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).  Rather, the matter must be remanded so that the record may be further developed to cure the deficiencies noted above.  Accordingly,

IT IS ORDERED that Magistrate Judge Morris' R&R is rejected.

IT IS FURTHER ORDERED that defendant's motion for summary judgment is denied.

IT IS FURTHER ORDERED that plaintiff's motion for summary judgment is granted

and this matter is remanded for further proceedings as specified above.  This is a sentence four

remand under § 405(g).


|  | S/ Bernard A. Friedman_____ |
|---|---|
| Dated: October 29, 2015 | BERNARD A. FRIEDMAN |
| Detroit, Michigan | SENIOR UNITED STATES DISTRICT JUDGE |

13